[Civ. No. 11349. First Appellate District, Division One.—December 27, 1940.]

HARVEY HACKETT SANBORN, Appellant, v. PACIFIC MUTUAL LIFE INSURANCE COMPANY (a Corporation), Respondent.

Courtney L. Moore for Appellant.

Pillsbury, Madison & Sutro for Respondent.

WARD, J.—This is an appeal from a judgment for defendant company in an action to recover disability indemnity under three health insurance policies. The subject of dispute is the difference between disability indemnity at the full rate, as provided in the policies as originally issued by The Pacific Mutual Life Insurance Company of California, and that at the limited rate of twenty per cent as paid by respondent, the successor to that company.

In 1921, The Pacific Mutual Life Insurance Company of California, hereinafter called the original or old company, issued three non-cancellable income insurance policies, referred to as "non-can" policies, to plaintiff, Harvey Hackett Sanborn. Among other things they provided for indemnity "against disability . . . resulting from sickness; such disability . . . to be such as will result in continuous total loss of business time". Provision was also made that in case of such disability "the company will pay indemnity . . . during the continuance of disability as defined above until such time as the Insured engages in a gainful occupation".

In January, 1934, appellant suffered an attack of angina pectoris, combined with arteriosclerosis. Upon proper notification in accordance with the terms of the policies, the in-

surer paid appellant indemnity of $500 a month until March 7, 1935, at which time, due to financial reverses suffered by him, and because his law partner had become ill and was unable to carry on their law practice, appellant went back to work. At this time the original company under a "Receipt and Release" agreed to pay him the sum of $1500 in full settlement of monthly benefits that might otherwise accrue prior to August 24, 1935. While appellant was engaged in his profession, on July 22, 1936, the Insurance Commissioner of the State of California, as conservator of all the properties of the old company, entered into a rehabilitation and reinsurance agreement with the Pacific Mutual Life Insurance Company, hereinafter called the new company. (Insurance Code, Div. 1, Pt. 2, ch. 1, art. 14.) In connection with policies of the type held by appellant, the agreement provided that the new company "does not assume any liability for monthly benefits on Non-Can Policies reinsured hereunder unless the disability commenced prior to the effective date of this agreement and notice of claim was filed in accordance with the terms of the policy, and in no event later than twenty (20) days after the effective date of this agreement, except to the extent of the following percentages of the monthly disability benefits originally provided under said policies . . . ''

After appellant's return to work no disability payments were claimed and none were made. In January of 1938, appellant suffered a "cerebral hemorrhage, hypertension" and he has not been able to resume work since that time. On February 1, 1938, he notified the new company of his illness and made a claim for disability indemnity. The company declined to pay the full rate as provided in the policies as written by the old company, contending that the disability had not commenced prior to July 22, 1936, and that claim had not been made therefor within twenty days after that date. The new company did, however, pay the limited indemnity of twenty per cent, $100, as provided in the rehabilitation and reinsurance agreement.

In connection with the above agreement, the situation as it existed prior to the rehabilitation of the old company is set forth in *Carpenter* v. *Pacific Mut. Life Ins. Co.*, 10 Cal. (2d) 307, where, at pp. 336, 329, 331, 332 and 322 [74 Pac. (2d) 761], the court said: "The non-can policies were draining the old company to disaster. If any plan of rehabilita-

tion was to succeed it was imperative that the integrity of the life business be preserved in order to earn profits for the benefit of all concerned, including the non-can policyholders.'' ''Obviously, if an insurance company gets into financial difficulties, something must be done to remedy the situation. Either the company must be liquidated, and its assets distributed to its creditors, thus immeasurably injuring many of its policyholders who are thus deprived of insurance protection, or the business must, if possible, be rehabilitated.'' ''The convention examination disclosed that the old company was fundamentally sound, and that all its reserves were unimpaired, except those pertaining to the non-can policies, as to which there was a deficiency of approximately $23,000,000. The company had intangible assets consisting of good will, going concern value, and an extensive agency organization worth several millions of dollars. All these intangible assets would be lost if the old company were liquidated. The old company was powerless to change the existing non-can policies. The contract and due process clauses prohibited the company from making any changes therein. But these prohibitions do not apply to the state acting under its police powers. Obviously, if the agency organization were to be preserved pending court approval of a rehabilitation plan, the business of the old company had to be continued. Faced with these facts the commissioner determined to organize a new company to continue the business pending the approval of a rehabilitation plan. All these steps, after a full hearing, were later approved by the court.'' ''The plan does not require that old company policyholders are compelled to accept the offer of the new company to assume the old company's policies. Each policyholder is given a reasonable time to elect whether to accept or reject the offer.''

In this case the following questions arise: What was the effective date of the agreement between the new company and the insurance commissioner as conservator of the old company? Did appellant's present disability commence prior to such date? Was notice of claim filed in accordance with the agreement?

The commissioner, as conservator or liquidator, may enter into rehabilitation agreements subject to the approval of the court. (Insurance Code, sec. 1043.) The effective date of the agreement herein was designated as ''July 22, 1936, at the hour of one o'clock P. M. Pacific Standard

Time.'' Immediately after its execution, an order of approval was inadvertently, but in good faith, made by one of the judges of the Superior Court of the County of Los Angeles, who was a policyholder in the original company. A second order by another judge was thereafter made on December 4, 1936, in effect the same as the first. The Supreme Court of this state upheld the second order from which an appeal was taken. (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra.*) In January, 1939, the Supreme Court of the United States took similar action. (*Neblett* v. *Carpenter*, 305 U. S. 297 [59 Sup. Ct. 170, 83 L. Ed. 182].)

Appellant contends that until such time as the agreement was finally upheld by the United States Supreme Court— the adoption of which date as the ''effective date'' of the agreement would be of assistance to appellant—the provisions of the old policy prevailed, and that, notice of claim of the later disability having been filed before the date of such affirmance, he is entitled to disability indemnity in accordance with the provisions of the policy as originally written and not as provided in the rehabilitation and reinsurance agreement. **[2]** It is true that the decision of an appellate court of resort is a final adjudication of the issues involved on an appeal. Unless an issue is determined contrary to the order as originally made, in whatever form it may be, the order stands. In this case the appellate courts simply affirmed the order of the lower court. That order was an approval of the rehabilitation and reinsuring agreement, which provided, as we have seen, that the effective date thereof was July 22, 1936. The appeals did not delay this effective date, which was necessarily fixed in accordance with the agreement of the parties. While the agreement did not become actually operative until approved by the court, an effective date of December 4, 1936, would be of no benefit to appellant as the notice and claim in connection with his later illness were not filed until long thereafter.

Appellant also contends that as long as the appeals were pending the commissioner of insurance could not turn over the properties of the old company to the new company. This contention may have been technically correct, a matter which we do not feel it necessary to pass upon on this appeal for the reason that appeals to the Supreme Court of California and the Supreme Court of the United States are in no sense trials *de novo* as is sometimes the case under statutory

provisions regulating appeals or hearings after trial in certain inferior courts, tribunals, boards or commissions. An appeal is not a trial but simply a method given litigants of rectifying errors, legal or factual, that may have occurred at a preceding hearing generally referred to as a trial. An appellate court is a reviewing court, and (except in special cases where original jurisdiction is conferred upon it) not a trial court or court of first instance. ▉ The jurisdiction of an appellate tribunal is generally confined to the correction of errors committed in the trial court, and its power may not be extended beyond the jurisdiction conferred by the Constitution (*Pacific Telephone etc. Co.* v. *Eshleman,* 166 Cal. 640 [137 Pac. 1119, Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652] ; Const. of California, art. VI, sec. 4) unless subsequent constitutional provision is made to cover such case. This has occurred in some instances, notably in Railroad Commission matters (*Southern Calif. Edison Co.* v. *Railroad Commission,* 6 Cal. (2d) 737 [59 Pac. (2d) 808]), but no such provision applies to appellate jurisdiction in cases involving insolvency and delinquency proceedings of insurance companies. (Insurance Code, Div. 1, Pt. 2, ch. 1, art. 14, *supra.*) ▉ Under no conditions is an appellate court permitted to rewrite the terms of a contract. All that was decided on the Carpenter appeals was that the order of the superior court was without reversible error. The appeal having been affirmed, the transaction between the parties is fixed in accordance with the terms of the contract.

In the Carpenter case, (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra*) referring to the contents of the petition for rehabilitation, also here involved, the court (pp. 319, 320) said: " . . . that it is in the interests of all concerned to preserve the good will, the agency organization and the going concern value of the old company ; that in order to accomplish these ends the commissioner organized the new company and on July 22, 1936, purchased all its stock with $3,000,000 of old company funds, and on the same date transferred to the new company all the other assets of the old company except the stock of the new company and certain described claims ; that 'since said July 22, 1936, your petitioner, as conservator, and through the agency and instrumentality of the new company, has continued to carry on and conduct the business and affairs of the old company, and to preserve, so far as possible, its good will, going concern value, and agency organization.' " A number of ob-

jections, factual and legal, had been raised by "various persons and groups". When approved by the court, the effective date was not postponed until December 4, 1936. It was the duty of the court to approve or disapprove the agreement as presented. The agreement did not provide that it would become effective on the date of approval or in ten days or at any other time thereafter. The court could not rewrite the agreement by substituting a different date of effectiveness. Of necessity a definite date had to be fixed. If some indefinite time had been designated, changed conditions might not have warranted the acceptance by one or both of the parties of the terms of the agreement, or the amount paid by the new company to the old might not have been acceptable to the parties.

 Moreover, the contention that the effective date of the agreement was January 3, 1939, is not available to appellant. His complaint alleges: "That the disability had commenced prior to the effective date of said reinsurance agreement, that is to say, had commenced prior to July 22, 1936." The merits of the case having been tried by each side upon the theory that July 22, 1936, was the effective date of the agreement, and the judgment having been rendered with that date as the basis of the decision, appellant is not permitted upon appeal to substitute some other date, and thereupon urge a reversal; nor, assuming that it could be maintained as the date of actual effectiveness, can an appellate court substitute such date of January 3, 1939. (*McNeny* v. *Touchstone,* 7 Cal. (2d) 429 [60 Pac. (2d) 986]; *Wall* v. *Equitable Life Assur. Soc.,* 33 Cal. App. (2d) 112 [91 Pac. (2d) 145]; *Papineau* v. *Security-First Nat. Bank,* 6 Cal. (2d) 668 [59 Pac. (2d) 131].) In *Ernst* v. *Searle,* 218 Cal. 233, 240, 241 [22 Pac. (2d) 715], the court said: "The rule is well settled that the theory upon which a cause is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." If appellant's present theory is correct, he should have pleaded and proven it. Assuming the presentation to the trial court of the opinions on appeal in the Carpenter case, or their introduction in evidence, if such introduction occurred, there is nothing therein proving the effective date of the agreement to be January 3, 1939. The only effect in

this respect of such introduction would be the fixing of the dates of the decisions; the opinions afforded no proof of the effective date of the contract.

■ Up to this point the effective date of the agreement has been considered particularly with reference to the parties thereto, namely, the old company and the new. The approved agreement provided: "Policy holders and policy claimants of the Old Company may elect to accept or reject the reinsurance and assumption hereunder of his policy, contract, or claim at any time within seventy-five (75) days after the entry of the order approving this agreement. The filing with the New Company after the entry of the order of the Court approving the agreement of any claim or proof of loss shall constitute an acceptance of this agreement and a waiver of any right to reject the same. Any policy holder or policy claimant who shall fail to notify the New Company, in writing, of his rejection within said period shall automatically be deemed to have assented to and become bound by this agreement, and entitled to the benefits hereof."

Appellant was officially informed of the provisions of the rehabilitation and reinsurance agreement on December 16, 1936. No notice of rejection was presented by him, although at some indefinite date he communicated to a representative of the defendant company that he "did not consider his reorganization agreement very good" and that he would take them to court if they did not pay claims "that were ever due me under those original contracts".

■ Appellant points out that there is a distinction between disability and the right to indemnity therefor under a policy. His claim is that under the rehabilitation agreement, where an insured has been disabled and his condition is such that in the exercise of due care for his health he should not return to work, the fact that he does so should not prevent him from claiming that the disability under which he now suffers is no more than a prolongation of the original disability. In other words, that the effect of resuming work is merely to suspend the right to indemnity payments for the period of such resumption. The disability as described in the policies is such "as will result in continuous total loss of business time".

Appellant cites cases holding in effect that an insured may claim total disability and total loss of business time, for which he may recover indemnity, where, notwithstanding he

performs a few minor duties of his business, his health is such that in the exercise of due care therefor he should cease business activity entirely. Appellant states his contention in the following manner: ''The law does not require absolute helplessness for a person to be totally disabled, but all that the law requires is that the insured must become so ill and suffer from such a disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way.'' (*Fitzgerald* v. *Globe Indem. Co. of N. Y.*, 84 Cal. App. 689 [258 Pac. 458] ; *Sherman* v. *Continental Casualty Co.*, 103 Cal. App. 518 [284 Pac. 946] ; *Pacific Mut. Life Ins. Co.* v. *Ringold*, 47 Fed. (2d) 738; *Wright* v. *Prudential Ins. Co.*, 27 Cal. App. (2d) 195 [80 Pac. (2d) 752].)

Assuming that a disability had occurred prior to July 22, 1936, as in fact one had, still appellant is not in the same situation as the insured in the above cited cases. Appellant's lack of health may have hampered him and may have reduced his earning capacity; he may have continued to suffer from his old illness. He could have continued with the $500 a month indemnity payments, but he did not choose to do so. The court found that between March 7, 1935, and January 21, 1938, he was fully able to and did gainfully employ all business time in the practice of his profession; that he did not suffer such disability as resulted in continuous or total or any loss of business time or any disability whatsoever. The evidence is strong enough to support this finding. According to his own testimony, appellant's net income from the practice of law in 1935 was $15,851.10; in 1936, $19,225.87, and in 1937, $22,193.01. In behalf of clients he appeared in many trials and proceedings in the federal and state courts, also before the Railroad Commission and legislative committees. He may not have been able to stand the strain of work as he did when he was younger, but his labor was far beyond the performance of trivial acts (*Sherman* v. *Continental Casualty Co., supra*) ; it was of a continuous and substantial character. His return to work not only suspended the right to indemnity payments, but under the circumstances of this case broke the chain of disability. In *Martin* v. *Postal Union Life Ins. Co.*, 31 Cal. App. (2d) 329 [87 Pac. (2d) 897], the court had before it a similar policy. At pages 332, 333 of its opinion, the court said: ''It will be noted that the terms of the insurance policy quoted

are exceedingly stringent in effect, in that they provide, in order that one may be considered totally disabled, that he be not only wholly prevented from performing each and every duty pertaining to his occupation, but also 'from attending to any business or any occupation whatsoever.' " "The fact that the assured received little or no remuneration for the work done is not the controlling factor. The question is: Did he actually, and in a substantial manner, perform the duties of any occupation or business? The answer must obviously be in the affirmative."

The determinative question in this case is not whether appellant was entitled to indemnity during the period in which he actually worked, but whether had he not worked during that period he would have been entitled to full payments in accordance with the terms of the policies prior to the rehabilitation of the company. Upon his return to work, on receipt of the payment of $1500 by the company, he waived under the first claim of disability all rights to benefits that might have accrued prior to August 24, 1935. The notice of appellant's second illness was presented to the reinsuring company February 1, 1938. No claim was therein made of illness prior to January, 1938, nor is there any claim that the illness complained of was a continuation of a previous illness. The attending physician reported that the sickness was "cerebral hemorrhage, hypertension", contracted on January 21, 1938. The same physician testified that the heart condition causing angina pectoris and the cerebral hemorrhage both evidence arterial degeneration, but answered "Yes" in response to the following question: "And this cerebral hemorrhage that he suffered in 1938, in January, was an entirely new thing, wasn't it?" The witness further testified that it was the cerebral hemorrhage that incapacitated appellant in 1938. The court found: "The aforesaid disability suffered by plaintiff between the 21st day of January, 1938, and the commencement of this action did not commence prior to July 22, 1936, and no claim or notice of claim by reason thereof was filed or given to said Old Company or the defendant herein on or before July 22, 1936, or within twenty days after July 22, 1936." The evidence amply supports the finding. We are precluded from disturbing the judgment. (*Ives* v. *Prudential Insurance Co.*, 12 Cal. App. (2d) 306 [55 Pac. (2d) 273]; *Dietlin* v. *General American Life Ins. Co.*, 4 Cal. (2d) 336 [49 Pac. (2d)

590]; *Raggio* v. *Mallory,* 10 Cal. (2d) 723 [76 Pac. (2d) 660].)

The judgment is affirmed.

Peters, P. J., and Knight, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied on February 24, 1941. Edmonds, J., and Carter, J., did not participate.